And we'll move on to the next case. United States v. Morales. Mr. DeLosa. Terribly sorry, Ms. DeLosa. Good afternoon, Your Honor. May it please the I'm here on behalf of the appellant, Ms. Sherrymae Morales. At this time, I'd like to request two minutes for rebuttal. Thank you. Your Honors, the indictment was constructively amended at trial. Ms. Morales was charged on the sole theory of making false misrepresentations of material fact to the Virgin Islands National Guard. She was not charged. What in the indictment says that? What in the indictment says that she's solely charged with making misrepresentations? I'm sorry, Your Honor. What what in the indictment says that the theory of prosecution is making misrepresentations? The indictment alleges the the statutory language of the wire fraud count, making either false misrepresentations under false pretenses or false promises. Nowhere in the indictment is What is a pretense? What is a pretense? I think a pretense is defined at common law, Your Honor, as a false statement making a false statement. No. Isn't a pretense, isn't pretense defined as making something appear to be true when it is not true? I don't believe that that's how it's defined. It's defined by the case law or by a common law. A false pretense is actually making a false statement. How about disregard? Isn't it a fact that wire fraud can be prosecuted by way of an omission? It absolutely can be prosecuted by way of omission. However, here the indictment did not allege and the facts did not allege in the indictment that the theory of culpability would be prosecuted through omission of a material fact. And that's the that's a juxtapose. Our position, Your Honor, is that Ms. Morales did not have notice of What was the prejudice, counsel? How would your defense have differed? I think that it would have differed in a couple of ways. Ms. Morales was surprised by, first of all, the additional theory of culpability. She was also surprised by the additional victim of Military Personnel Services Corporation. She was not prepared to defend against omissions of material fact in relation to the Military Personnel Services Corporation. The indictment gave her notice that she was she was to defend against material misrepresentations made to the Virgin Islands National Guard. And the indictment laid out the loss calculations as well specific to the Virgin Islands National Guard, correct? The indictment gave a chart. It's counts three through 36, which gave the date and the wire transfer. Her pay, her pay. Correct? Yes. Yes, Your Honor. If the National Guard has a requirement that you work 40 hours for us, and you can hold no other full time employment with any other entity, and she does exactly that, and doesn't tell the National Guard, isn't that an omission that is subject to violation of the law? I think you've hit the nail on the head, is that omission is absolutely an actionable offense under the under the fraud statute. It was not a charged offense in this indictment. So where she could have been absolutely charged where the government could have alleged omission, they didn't. They didn't give Ms. Morales notice that this was a theory of culpability. Concealment of material information. Same thing, Your Honor. It was not concealment of material information is is not what was charged in in the indictment. That is a that is an offense that Ms. Morales was not was not given notice of prior to the indictment. The indictment tracked the statutory language. The statute or the wire fraud statute does not include the term omission, does it? The wire fraud statute does not include the term omission. However, I think that the jury instructions certainly anticipates that the either the facts would would allege omission, could allege omission, and that there have been indictments where the government does actually allege omission of material fact. Additionally, Your Honor, do you think that an indictment that doesn't specifically charge omission precludes the government from relying upon omission as a means or as part of the scheme to defraud? Your Honor, there are several cases which say that an addition if the government charges an additional theory of culpability, one that is not alleged either through facts or through the statutory language in the indictment. For example, this court in United States v. Syme, that case is like this case in that there was a chart. In the chart, there was several allegations of different dates for the jury could consider all of the theories of culpability. I think in that case, there were three theories of culpability specific to each charge. However, all three were not alleged for each charge. And this court found that there was a constructive amendment of that indictment because the district court erroneously instructed the jury that they could consider all three theories of culpability when that was not charged for each charge. Did the district judge here track the Third Circuit's model jury charges? He did to an extent, Your Honor. I think that he added and deleted portions of the Third Circuit model jury instructions. And again, Your Honor, I think that those jury instructions certainly anticipate that either the government will fully and completely allege the theories of culpability within the indictment either through the facts or through the statutory language. Let me ask you about the loss calculation. What's your position as to how loss should have been calculated in this case? Your Honor, our position is that there was no actual or intended loss to the Virgin Islands National Guard. There was substantial testimony that Ms. Morales was an exemplary employee, that she worked very long hours. Her supervisor and his supervisor each said that it was not uncommon for Ms. Morales to work 13, 14-hour days at the Virgin Islands National Guard. It was undisputed that Ms. Morales never missed an assignment, never shirked her duties. She was consistently described as excellent. So the short version is they got what they paid for? They absolutely got what they paid for and more. And Your Honor, this court in Evans found that the proper measurement of actual loss should be determined by the harm inflicted. And that if the recipient they defrauded actually was benefited by the services, that the defendant's sentence should not be enhanced. Is it your position that she was required to work 40 hours for the National Guard? Yes, Your Honor. She was also required to work 40 hours for the services personnel? Yes, Your Honor. Is it your argument that she worked 80 hours a week and that therefore there was no loss to the National Guard? I mean, 80 hours a week sounds like 11 and a half hours a day, seven days a week, no time for commuting, no time for meals. And I think the testimony certainly supports, Your Honor, that Ms. Morales was working every weekend. She was working 13 to 14 hour days during the week for the Virgin Islands National Guard. The other thing I will call your attention to is that the fact, Military Personnel Services Corporation is not a victim. So if she worked 40 hours a week for the Military Personnel Services Corporation or didn't, that's neither here nor there. The fact is that she put in her pound of flesh at the Virgin Islands National Guard. She gave them 40 hours. They benefited from her services. There was testimony that once dormant programs were now flourishing under Ms. Morales' tenure. How about the idea that if the National Guard knew that she was putting in 40 hours for the services personnel, they wouldn't have hired her? They would have fired her on the spot and they would have saved $90,000 a year or $45,000 a year. Your Honor, that gets back to the issue of Ms. Morales' failure to alert or correct her colleagues was not charged in the indictment. She was not prepared to defend against the fact that her omission to the Virgin Islands National Guard was a crime. Can you distinguish this from the Second Circuit, Barnes? Are you familiar with that case? Absolutely, yes. In the Burns case, Mr. Burns attended an MBA program at Harvard. In the Burns case, the district court there was able to actually take the attendance records from his Harvard classes. They were able to calculate the time that he spent at Harvard during normal business hours when he was supposed to be working for his employer. They actually did the fraud calculation by multiplying the hours that they could document that he was at Harvard while he was supposed to be working and multiplied that by his hourly rate. That district judge came up with a loss calculation that was substantiated by the facts, that was substantiated by the evidence presented. Ms. Morales, the difference is that no one can substantiate that Ms. Morales did not show up to the Vang every day, did not put in her time, and did not do exemplary work. Also, Ms. Morales did not put in timesheets. Mr. Burns, through an agent, put in false timesheets. Ms. Morales didn't do that. How were Ms. Morales' hours calculated? How would the National Guard know whether she was there or not? Every week, bi-weekly, the fiscal office sent a form to her supervisor and her supervisor certified that she was in fact there and put in her 80 hours bi-weekly. Can you address also the argument that the amount of the loss, I know your position is that there was no loss, but you have an alternative argument that the loss should be even less so that the guideline range would be 8 to 14 months. Could you address that please? I sure can, Your Honor. Yes. During Ms. Morales' sentencing hearing and even prior to that in her sentencing memorandum, defense counsel provided the district court with a calculation confined to the counts of conviction, so counts 15 to 35. That calculation was, if you take the gross salary that she received stated in the indictment, came to $70,000-ish. If the district court were to give the same 50% credit that it did for the $90,000 calculation, that drops her total offense level from a 13 to an 11. It's a two-point reduction and thus directly affects her applicable guideline sentence. It would get her back to an 8 to 14. Because that would make her add six points, you're saying? She would start... She started at seven. Started at seven, Your Honor, yes, and then she would only be given four points for the loss calculation. Half of that number, all right. Yes. Did you represent Ms. Morales at trial? I did not. Who was that? Attorney Jupiter. And Mr. Potter was representing the National Guard? Yes. Okay, thank you. Nothing else? Thank you. We'll get you back on the phone. Thank you very much. Okay, Mr. Potter. Good afternoon, Your Honor. Edward Potter for the United States. Your Honor, this entire case was about fraud and deception on Ms. Morales' part. And the argument that somehow the indictment was constructively amended, there's no basis for that. From the opening statements of the government, from the discovery that was given to the defendant in this case, it clearly showed what the government's theory was. And that was that Ms. Morales misrepresented her position with the NPSC. The testimony at trial was that she led everyone to believe in the National Guard, that she was volunteering in this position when, in fact, she was being paid. The testimony from General Lewis was that Ms. Morales came to him and asked, can I have this second job with the NPSC at the same time I'm working full-time with the National Guard? And he asked if she was crazy. He was like, no, you cannot do that. And further on, I think he was asked on cross-examination or maybe on direct examination, well, why is it that you did not see to it that Ms. Morales did not continue to hold a job with the NPSC? And his testimony was, you know, I'm her boss. I am the chief of staff. I told her she could not do it, and I assumed once I gave her the instruction that that's what she did. Other than his instruction, was there a specific written regulation concerning secondary employment? I don't know that there was any specific written instruction that was admitted at trial, but the testimony from General Lewis is that it's forbidden, that even if he wanted to approve Morales holding both positions, that he had no authority to do that because it was forbidden. So there was no way around it. It's forbidden by whom or what? By policy of the National Guard. I would have to say written policy, but again, at trial there was no document that was admitted showing that there was a written policy regarding the employment. This is General Lewis you just referred to, right? Let me just ask you about General Lewis in the context of the loss. He was very complimentary of her work, correct? Yes. All of your witnesses were extremely complimentary of her work. I'm not sure that all of them were. Who wasn't? I'm not sure that all of them spoke specifically to the quality of her work. I know General Lewis did. The people that did speak specifically to the quality of her work were all very complimentary. Yes. Where's the loss? The loss is... She did the work. Where's the loss? Well, the loss is how much work she could have done. Clearly she did the work that was assigned to her. There's no evidence in the record that she did not. So she did what was assigned to her. She did what she was paid for. So where's the loss? The loss is the fact that the National Guard, number one, if they knew that she was working full-time at another employer, they would not have spent that money and given it to her to perform services with the National Guard. Either they would have not filled that position or they would have filled the position with someone else. But that does not negate the fact that she did the work. Are you familiar with the Nagel case? Yes. And in Nagel, this circuit said, we have repeatedly emphasized that the amount of loss in a fraud case, unlike that in a theft case, often depends on the actual value received by the defrauded victim. They got what they paid for, didn't they? I'm not sure that they got what they paid for. What didn't they get? I need you to answer that question. What did they not get? They did not get the benefits of their bargain for hiring Ms. Morales. All your witnesses were complimentary of her work. Well, my position is if they gave her work and she performed the work four hours a day and she goofed off. But there's nothing in the record that suggests she goofed off.  Well, no, the record is that as far as they're concerned, as far as General Lewis is concerned, for the time that he was her supervisor, she performed the work. Rivera said the same thing. Excellent. She's one of my best workers. I would put her up against anybody. Yes. She said? Yes. They both said that. But, again, I'm asking the court to consider, if they hired Ms. Morales to perform general job duties and she successfully performed the duties. Which is what happened here. Which is what happened here to some extent. To some extent. If you can cite me somewhere in the record where they did not get what they paid for. I'm just making a general argument that if, in fact, she gets assignment A and she completes assignment A and there are hours in the day left that they can give her assignment B, but she goes... You're assuming things. Your witness didn't say anything like that. They were quite the contrary. Right. They said that she performed the work that was assigned to her. That she did her work. She was among their best employees is what they're saying. Some of them said she was among the best employee. Yes. So there's still a loss as to where the loss is here. But the loss is that she was hired to perform eight hours' work Monday through Friday. And she did not do that. How do you know that? Because at the very same time she was working for the MPSC Monday through Friday, performing eight hours' work a day. How could she have done both? She was doing both. She was working about 12, 13 hours a day. No, I think the testimony from General Lewis was that he would come to work at times and see Ms. Morales working after hours. He did not say that every single day she was working... He testified he'd see her there as early as 730 in the morning. Or when he would arrive at 730 in the morning she was already there. Yes, I don't dispute that. But my question is, sure she was working, but she was not working the hours that the National Guard hired her to perform working. She was not doing it. She was working somewhere else, doing something else at the National Guard's time. The district judge... There's a loss there. The district judge couldn't come to an assessment of actual loss. He knew that what was paid was something like $90,000. Yes. But then he basically said, I can't figure it out, so I'll just cut it in half. Do you think that was the right method to arrive at actual loss? Well, I think given the record that was before the court, meaning that given the fact that the court was unable, and would never have been able to figure out how much hours did Morales dedicate to the National Guard. In that light, Mr. Potter, do you think it was your burden to show this is what we lost in this case, as a result of being defrauded? Well, I agree. I agree it was the government's burden to show that Ms. Morales could not have performed 80 hours of work in a 40-hour work week. What did you say to the district judge as a basis for arriving at the actual loss that the National Guard suffered? The actual loss was the gross salary that Ms. Morales received on account of conviction. That supposes that she got no benefit at all. Well, the district court thought that they were going to give Ms. Morales credit for work that she did perform. And the only thing in the record was that she performed 80 hours in a 40-hour work week for two employers. And basically, the only thing that the judge could have done, given those facts... Supposing she, of those 80 hours, she spent 80 hours, 60 hours working for the National Guard, and the other 20 working for the military personnel. That means you got more than you bargained for. Well, there was nothing in the record to suggest that that's what happened. I think the testimony... There's nothing in the record to suggest anything. Well, the testimony from Ms. Morales was, you know, she didn't have to work a 40-hour work week because she was a... But there was nothing on the record to suggest there was any loss to the National Guard. Zero. Show me something in the record that you can quantify consistent with the Nagel analysis suggesting that the National Guard lost anything. Show me where they didn't get actual value received. I want you to specifically cite to the record, not extrapolating. I don't believe that there is anything specifically in the record that says Ms. Morales did not perform services for the National Guard, that the National Guard thought was excellent. Where's the loss? The loss to the National Guard is their ability to get a dedicated employee who will work 40 hours in a five-day work week. Ms. Morales did not do that. She worked whenever... Supposedly she worked whenever she wanted to work. She got the job done. And that's also assuming that she was putting 40 hours in MSPC, which is part of the equation here. They're not the victims. The victims are the National Guard. By my reading of the record, they got what they paid for. But MSPC also said that her work was limited to Monday through Friday, 8 to 5. The National Guard said her work was limited Monday through Friday, 8 to 5. MSPC is not a victim. So I'm talking... They're not a victim. The victim you charged is the National Guard. Yes. I still don't understand where the loss is, anything other than zero. Well, the loss is the gain to Ms. Morales. She did the work. She did the work. That's what NAGLE teaches us. It depends on the actual value received by the defrauded victim. They got what they paid for. You've told me as much. Well, the testimony from General Lewis was that he was satisfied with her work. I can't... The two witnesses, Lewis and the other gentleman, both testified that she was as good as they get as employees come. I can't contradict that. Okay. But the question is, so if Ms. Morales was able to work two hours, given the amount of work that the National Guard gave her, if she was able to complete her work in two hours... That's not what the record suggests. The record suggests she was there. She was there long hours, and she did the work that she was paid for. But the record suggests that she was not working 80 hours a day, monetarified for the National... I'm sorry, 40 hours a week, monetarified for the National Guard. The record suggests that she was splitting her work between the National Guard and the NPSC and billing both entities for 40 hours a week. We keep coming back to the same point. You and I both agree that there was no loss, right? I don't know that I want to... I thought you told me that earlier. Totally agree that there was no loss, Judge. I'm saying, could the National Guard have gotten more work out of Ms. Morales if she was dedicated to working 40 hours a week, monetarified? Theory of loss is what they might have gained. But the theory of loss is what benefits she received. That's a second theory of loss. What benefits she received, what gains she received. Agreed. And also, you can deduct whatever benefits the victim received, and we get back to zero. I don't know how it could be zero since Ms. Morales is not physically able to work 80 hours in a 40-hour week. I don't know how we get back to zero. I understand they said she did a good job. So that seems to be the only concern. As long as she did a good job, then we don't care whether or not she actually worked 8 hours, 2 hours, 1 hour. We don't care. We don't care if she was convicted of that, but I'm just curious. I'm focusing on the loss issue. How are we going to quantify the loss in this case, consistent with Nagel? An opinion just from last year. You know, Nagel was a case where it's very clear. It's easy for a court to subtract out expenses from a contract. It's easy to look at paper and say, okay, but the contract was $100,000. They expended $40,000. It's easy to see what the gain was. In an employment case, a dual employment case, where you have somebody working 80 hours supposedly in a 40-hour week, we know that's not possible. It's possible in Nagel because Nagel hired subcontractors. They had transportation expenses. They had... Yes. It sounds like your position is there must have been some loss, therefore, and I can't tell you what it is, therefore, why don't you just cut it in half and we'll make that the loss. Is that your position? Well, my position is that's what the district court found, that it was fair to do it that way. In a sense, I don't fault the district court because it seems like the district court didn't have very much to work with. I get the impression that was your burden to show. Yes, Judge. Yes. The district court could have come to the same conclusion by looking at the gain. He threw his hands up in the air and says, I can't decide this based on what's given to me, so I'll just cut it in half. But it would be impossible. Given the record, given the timesheets that Ms. Moradis, given the timesheets that were submitted on behalf of the MPSC, given the timesheets that were submitted on behalf of the National Guard, it's impossible. You cannot look at the timesheets and say, I mean, both say it's 40 hours a week. Is it the rule that when it's impossible, you just cut it in half? When it's impossible, you look at the gain. That would be a second argument. Look at the gain to Ms. Moradis. And the gain would be the salary that she received that she would not have otherwise received if she was honest in. . . Mr. Hanesky, do you have any questions that you wanted to. . . I have no other questions, Judge. Thank you. Thank you. Thank you, Judge. Thank you, sir. Ms. DeLosa. Thank you, Your Honors. Very briefly, the government continues to say over and over again that Ms. Moradis could not have worked 80 hours in a 40-hour work week. But again, that's not the issue here. The issue is whether she put in 40 hours as required by the VING. Even in the government's argument today, we still get NPSC, Military Personnel Services Corporation, as a victim in this case. Let me ask you a question. You're familiar with the United States v. Crowley. It's out of the Fifth Circuit. I am. That court held that it was reasonable for the district court in the loss calculation to include the entire salary and pension in the loss calculation, given that the position that the President had was procured by fraud, very similar to this case. Your Honor, we would argue that Ms. Moradis did not secure her position by fraud. We disputed that. And actually, all throughout trial, the defense counsel put forward that her supervisor knew that she was working for NPSC, knew that she was the ESGR coordinator prior to her position with the VING, and actually recruited her for the – The supervisor said, no, that's wrong. You can't work two jobs. It was a fact disputed at trial that the supervisor did not allow her or even encourage her to do this, Your Honor. That being said, Your Honor, the fact that Ms. Moradis was an exemplary employee, she gave the Virgin Islands National Guard everything, the benefit of their bargain, everything that they contracted her to do. I think that you can find no loss in this case. Why didn't you agree that the loss calculation was faulty? What's the remedy? Send the case back to the district court? Yes, Your Honor, you would. I mean, he may find that she worked less than 40 hours for the National Guard. I don't think that's supported in the record anywhere, Your Honor. The government continues to say that it was impossible for her to do or that, you know, 40 hours based on the fact that she worked for NPSC. That's not supported anywhere. That's nowhere in the record that she did not do what the Virgin Islands National Guard needed her to do, that she did not do every single duty that she was employed to do. It's just not supported. What's the remedy, Ms. Delosa, that you propose? Your Honors, in issue one and two, we would like reversal, vacate of the counts of conviction. For the sentencing issue is to remand with instructions on how to calculate appropriately the loss in this case. Is your client in custody? She is. How long has she been in custody? Six months, Your Honor. Are you asking that she remain in custody if we were to remand this? Absolutely not. We would ask that she be immediately released. Ms. Delosa, thank you very much. Thank you very much.